UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | | |
|---|---|---|
| CAIRO, individually and in her personal<br>capacity, | ) | |
| | ) | |
| | ) | |
| JASON MCNEILL, individually and in his<br>capacity as a registered voter and<br>an Elector, | ) | |
| | ) | |
| | ) | |
| | ) | **DECLARATORY JUDGMENT** |
| MATT COUTURE, individually and in his<br>capacity as a registered voter and<br>an Elector, | ) | **AND MODIFICATION OF** |
| | ) | **CONSENT JUDGMENT AND** |
| | ) | **ORDER SOUGHT** |
| | ) | |
| SOFIA PRIDE, individually and in her<br>capacity as a registered voter and<br>an Elector, | ) | |
| | ) | |
| | ) | Civil Action No. _____ |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | |
| SHENNA BELLOWS, Secretary of State,<br>State of Maine, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

NOW COME, Plaintiffs, Cairo, Jason McNeill, Matt Couture, and Sofia Pride by and through their undesigned counsel, file this Complaint against Defendant, Shenna Bellows, in her official capacity as Secretary of State of the State of Maine.

**THE PARTIES**

1. Plaintiff, Cairo (her mononym), is a natural person currently residing in Baytown, Texas. At all times material, Cairo was neither a resident of Maine nor a registered Maine voter and brings these claims individually.

1

2.      Plaintiff, Jason McNeill, is a natural person registered to vote in and residing in the Town of Brunswick, County of Cumberland, State of Maine.  He is an "elector" within the meaning of the Article II and Article IV, Part Third, Section 17-22 of the Maine Constitution.

3.      Plaintiff, Matt Couture, is a natural person registered to vote in and residing in the Town of Brunswick, County of Cumberland, State of Maine. He is an "elector" within the meaning of the Article II and Article IV, Part Third, Section 17-22 of the Maine Constitution.

4.      Plaintiff, Sofia Pride, is a natural person registered to vote in and residing in the Town of Falmouth, County of Cumberland, State of Maine.  She is an "elector" within the meaning of Article II and Article IV, Part Third, Sections 17-22 of the Maine Constitution.

5.      Defendant, Shenna Bellows, is the Secretary of State of the State of Maine ("the Secretary") under art. V, pt. 2, §§ 1-4.  The Maine Constitution's direct democracy amendments, art. IV, pt. 3, §§ 17-22, authorize the Secretary to administer the lawmaking authorities which those amendments returned to the people of Maine in their collective sovereign capacity.  The Secretary has no power over the direct democracy processes except as has been provided in art. IV, pt. 3, §§ 17-22.  Plaintiffs bring these claims against the Secretary individually and in her official capacity as Secretary of State of the State of Maine.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 2201 and 2202.

7.      This Court has personal jurisdiction over Plaintiffs Cairo, Jason McNeill, Matt Couture, and, Sofia Pride.

8.      This Court has jurisdiction over the Office of the Secretary of State and over Shenna Bellows, individually, in her capacity as Secretary of State.

2

9.      Venue in this district is proper under 28 U.S.C. § 1391(b) because the Secretary of State is a constitutional officer under the Maine Constitution and her powers and duties are exercised in the state of Maine and Secretary of State Shenna Bellows resides in the state of Maine.

## NATURE OF THE CASE

Plaintiffs' claims concern an unprecedented situation in which a state official, here the Secretary of State of the State of Maine, is relying on a Consent Order approved by this Court, which the Secretary, herself, assisted in drafting and which the Secretary approved, to invalidate the otherwise valid signatures of Maine electors on petitions supporting the Ballot Initiative resulting in the Secretary's disqualification of the Ballot Initiative from the November 3, 2026 general election ballot.

Plaintiffs contend that in approving the Consent Order, this Court never intended to empower, and, in fact, did not empower the Secretary to invalidate any elector signatures, let alone 1,520 such signatures.  Nor in approving the Consent Order did this Court intend to empower and, in fact, did not empower the Secretary to remove this Ballot Initiative or any such initiative or referendum from the ballot.

Accordingly, Plaintiffs ask this Court for declaratory relief as requested herein, to modify the Consent Order retroactive to its issuance to deny the Secretary any claim to the powers she has arrogated to herself through her misinterpretation and misapplication of the Consent Order, and to provide such other relief as this Court shall deem appropriate and warranted.

## INTRODUCTION

10.     This action arises out of the Plaintiffs' actions, individually and collectively, pursuant to art. IV, pt. 3, § 18 of the Constitution of Maine, to place a citizens initiative entitled,

"An Act to Designate School Sports Participation and Facilities by Sex" ("the Ballot Initiative") on the on the ballot for the November 3, 2026 general election.

11.     In order to be placed on the ballot, an initiative must obtain valid signatures from Maine electors in an amount "not less than 10% of the total vote for Governor cast in the last gubernatorial election preceding the filing of [the Ballot Initiative] petition. Me. Const., art. I, pt. 3, § 18.  To satisfy the Maine Constitution's 10% threshold, the Ballot Initiative required 67,682 valid elector signatures.

12.     Although on March 17, 2026, the Secretary issued a Determination validating a sufficient number of elector signatures to place the Ballot Initiative on the November 3, 2026 general election ballot, following a challenge by Ballot Initiative opponents, on May 26, the Secretary issued a Final Decision which reduced the number of valid signatures to 67,150, placing the Ballot Measure 582 signatures below the constitutionally-mandated threshold of 67,682 valid signatures.

13.     Having determined that the total number of valid elector signatures was below the constitutionally-mandated threshold, the Secretary disqualified the Ballot Initiative from the November 3, 2026 general election ballot.

14.      Among her rulings in her Final Decision, the Secretary invalidated all the petitions submitted by out-of-state Circulators Cairo, Ummsalaamah Hakeem, Kewechi Chekwuma, and Albert Jordan resulting in the invalidation of 1,520 elector signatures.

15.     Among the elector signatures the Secretary invalidated were those of Plaintiffs, Jason McNeill and Matt Couture, who had signed petitions circulated by Circulator Cairo. Plaintiffs McNeill and Couture were aggrieved by the Secretary's decision invalidating their signatures.

16.     The Secretary's Final Decision did not invalidate Sofia Pride's petition signature; hers was among the 67,150 elector signatures the Secretary determined were still valid.  Sofia Pride signed the petition supporting the Ballot Initiative with the intent that, if a sufficient number of electors also signed, it would be placed on the November 3, 2026 general election ballot.  The Secretary's Final Decision invalidating the 1,520 electors signatures gathered by Circulators Cairo, Hakeem, Chekwuma and Jordan, resulting in the Ballot Initiative's disqualification from the November 3 ballot  thereby frustrated Plaintiff Pride's exercise of her constitutional rights, as an elector, under art. IV, pt. 3, § 18 and she was thereby aggrieved.

17.     Essential to the Secretary's decision to invalidate the 1,520 elector signatures gathered by Circulators Cairo, Hakeem, Chekwuma and Jordan was her reliance on a Consent Order and Judgment issued by this Court.  *We the People PAC v. Bellows*, Civil No. 1:20-cv-000489 JAW (Doc. No. 88). Attachment A ("Consent Order"). Without the authority the Secretary claimed the Consent Order invested in her, the Secretary would have lacked any authority to invalidate the 1,520 elector signatures gathered by those four circulators.

### *We the People PAC v. Bellows*—District Court's Consent Order

18.     In December of 2020, We the People PAC and other plaintiffs brought an action in this Court challenging the residency and voter registration conditions art. IV, pt. 3, § 20 of the Maine Constitution on the grounds that, by excluding all out-of-state circulators they violated the First Amendment to the United States Constitution.  *We the People v. Bellows PAC*, 519 F. Supp.3d 13 (D. Me. 2021).

19.     This Court found that the *We the People* plaintiffs had shown a likelihood of success on their First Amendment claims both as to the Maine Constitution's residency and voter registration requirements and entered preliminary injunctive relief.  *We the People PAC*, 519 F.

Supp. 3d at 52-53.  On appeal, this Court's findings and rulings were upheld in their entirety. *We the People PAC,* 40 F. 4th 1 (1st Cir. 2022).

20.     After the appellate court's affirmance of this Court's ruling, the parties drafted a consent agreement which this Court approved as the  Consent Order.  The Consent Order superseded the injunctive relief that this Court had issued in its initial decision. *We the People PAC,* 519 F.Supp.3d at 53.

21.     This Court's decision and the First Circuit's affirmance show that the Secretary vigorously contested the plaintiffs' claims that Maine's residency and voter registration requirements violated the First Amendment.

22.     By contrast, neither the District Court's nor the First Circuit's decision contains any indication that there was any adversity between the *We the People* plaintiffs and the Secretary over the terms of Paragraphs 2(a)-(c) of the Consent Order or the comparable provisions of the District Court's initial injunction. See, *We the People PAC*, 519 F.Supp.3d 13, *passim*; 40 F.4th 1, *passim; cf.*, *Kasper v. Bd of Election Com'rs of the City of Chicago*, 814 F..32d 332, 338 (7th Cir. 1987) (intervenor challenging proposed consent agreement).

23.     The Consent Order consists of seven paragraphs.  Paragraph 1 granted judgment on Counts I through IV of plaintiffs' complaint which alleged that Maine's statutory requirements that petition circulators for petitions and referenda must be Maine residents registered to vote in  Maine violated the First Amendment to the United States Constitution. Attachment A, ¶ 1; See also, *We the People PAC v. Dunlap*, Civil No. 1:20-cv-000489 JAW (Doc. 1) (Counts I-IV).

24.     Paragraph 2 of the Consent Order barred the Secretary from enforcing the Maine Constitution's exclusion of petition circulators who were not Maine residents, art. IV, pt. 3, § 20,

and barred the Secretary from enforcing a companion statute to the same effect, 21-A M.R.S. § 903-A . Attachment A, ¶ 2. Paragraph 3 of the Consent Order barred the Secretary from enforcing the Maine Constitution's exclusion of petition circulators who were not registered to vote in Maine, art. IV, pt. 3, § 20, and barred the Secretary from enforcing its statutory companion 21-A M.R.S. § 903-A. *Id.*, ¶ 3.

25. Although Paragraph 2 of the Consent Order barred the Secretary from enforcing the residency exclusion against out-of-state circulators, Paragraph 2 provided further that the Consent Order's prohibition on enforcement only applied to those out-of-state circulators "who (a) agree to submit to the personal jurisdiction of Maine, for purposes of any investigation or prosecution of any alleged violation of Maine law with respect to initiative or people's veto petitions; (b) maintain up-to-date contact information with the Maine Secretary of State's office for the duration of any petition drive, which drive includes the collection of signatures and review of those signatures by the Secretary of State's office; and (c) are responsive to requests for information from the Secretary of State's office for the duration of the petition drive." *Id.* at ¶ 2(a)-(c).

26. Although the Consent Order closely tracked this Court's initial injunction, by the agreement of the parties, it omitted the initial injunction's provision that it applied to those out-of-state circulators "first" agreed to submit to Maine's jurisdiction. *Cf.*, *We the People PAC*, 519 F. Supp.3d. at 53; Attachment A, Consent Order at ¶ 2(a). As a result, in contrast to its predecessor term in the initial injunction, Subparagraph 2(a) of the Consent, lacked any timeframe which an out-of-state circulator must meet to signify that circulator's submission to Maine's jurisdiction.

27.    In addition, although subparagraph 2(b) and subparagraph 2(c) of the Consent Order each provided that it applied to out-of-state circulators for "the duration of any petition drive", this term does not appear subparagraph 2(a). *cf., Id.*, ¶ 2(b)-2(c), 2(a).

28.    By its plain terms, the Consent Order forbade the Secretary from enforcing Maine exclusionary constitutional and statutory residency requirements against out-of-state circulators who "agree to submit" to Maine's jurisdiction but did not specify **how** or **when** they must signify that assent, including whether they had to manifest their agreement at the outset of the petition drive, when the petitions were submitted to the Secretary, or, when and if the Secretary (or other lawfully empowered entity, such as the Office of the Attorney General), directly asked for their agreement "for the purpose of any investigation of any investigation or prosecution of any alleged violation of Maine law with respect to initiative or people's veto petitions." *Id.*, ¶ 2(a).

29.    As to those out-of-state circulators who did not "agree to submit", Paragraph 2 of the Consent Order was silent.  However, Paragraph 2 of the Consent Order must be read in conjunction with Paragraph 1, which had entered judgment in favor of the *We the People* plaintiffs on their claim that Maine's statutory residency provision was unconstitutional because it violated the First Amendment. *Id.,* ¶ 1.  Nothing in Paragraph 2 changed that adjudication.

30.    Neither subparagraph 2(a) nor any other provision of the Consent Order identified any sanction that the Secretary could impose on out-of-state circulators who, when presented with the occasion to signify their agreement to submit (whatever form that occasion might assume consistent with the Consent Order), failed to do so. *Id.*, *passim*.

31.    More particularly, at no place did the Consent Order suggest or even imply that it had empowered the Secretary to invalidate the signatures of Maine electors, who themselves were blameless, to sanction an out-of-state circulator's failure to manifest his or her consent at a

time and in a manner satisfactory to the Secretary (or other properly empowered authority). *Id.,*
*passim.*

32.     After this Court approved the Consent Order, the Secretary amended the standard
Circulator's Affidavit form to include terms by which an out-of-state circulator could indicate his
or her consent to jurisdiction.  The revised form included two boxes, one, where the circulator
could indicate whether he or she was a resident of Maine.  The second box was added for
circulators who were not residents of Maine. This second box, referred to hereafter as "the
Jurisdiction Box," read:  "I agree to submit myself to the jurisdiction of the State of Maine for
any investigation or prosecution for any alleged violation of Maine law with respect to initiative
or people's veto petitions."  Attachment B (Circulator Affidavit Form).

33.     Despite lacking any direction from the Consent Order on these points, the
Secretary revised the Circulator's Affidavit to include the Jurisdiction Box.  The Secretary has
since cited 21-A M.R.S. § 21 as the authority for her addition of the Jurisdiction Box to the
Circulator's Affidavit.  But, because the direct democracy amendments  only authorized the
Legislature to enact laws "applying" them, providing that those statutes could not be
"inconsistent with the Constitution," and because the Legislature enacted Section 21 pursuant to
this specific constitutional grant of authority and because the residence and voter registration
provisions remained intact at art. IV, pt. 3, § 20, Section 21 could not provide the Secretary with
the authority to revise the Circulator's Affidavit.  That is because Section 21 could not authorize
the Secretary to issue a form the purpose of which was to circumvent the Maine Constitution's
residency and voter registration exclusions.  See, Me. Const., art. IV, pt. 3, § 22.

34.     At no point did subparagraph 2(a) or any other part of the Consent Order cite any
Maine statute as empowering the Secretary to implement its terms.

9

35.    On information and belief, at no time did the Secretary return to this Court to request a ruling that the Secretary's addition of the Jurisdiction Box to the Circulator's Affidavit was consistent with the Consent Order in general or subparagraph 2(a) in particular.

### Protect Girls Sports in Maine Ballot Initiative

36.    In 2025, the Secretary certified the Ballot Initiative.  Thereafter, supporters of the Ballot Initiative began seeking the signatures of Maine electors to meet the 10% voter threshold required by art. IV, pt. 3, § 20 of the Maine Constitution.

37.    When petitions were circulated seeking the placement of the Ballot Initiative on the November 3, 2026 ballot, the Consent Order was in full force and effect and, at present, remains in full force and effect.

38.    Cairo, Hakeem, Chekwuma and Jordan are professional petition circulators.  They were retained to circulate petitions to Maine electors to obtain signatures in support of the Ballot Initiative.

39.    At the time they were circulating petitions for the Ballot Initiative, Cairo, Hakeem, Chekwuma and Jordan were not registered Maine voters and were not Maine residents. See, Me. Const., art. IV, pt. 3, § 20; 21-A M.R.S. § 904-A(4)(C).

40.    On December 12, 2025, Plaintiff Jason McNeill signed a petition circulated by Cairo to place the Ballot Initiative on the November 3, 2026 general election ballot.

41.    On December 12, 2025, Plaintiff Matt Couture signed a petition circulated by Cairo to place the Ballot Initiative on the November 3, 2026 general election ballot.

42.    On November 3, 2025, Plaintiff Sofia Pride signed a petition circulated by Ryan McMann to place the Ballot Initiative on the November 3, 2026 general election ballot.

43.     On February 2, 2026, petitions supporting the placement of the Ballot Initiative were submitted to the Office of the Secretary of State.  The number valid elector signatures needed for placement on the November 3, 2026 general election ballot was 67,682.

44.     When Circulators Cairo, Harkeem, Chekwuma and Jordan submitted their petitions to the Secretary of State along with their Circulator's Affidavit, none of them had checked the Jurisdiction Box in their respective Circulator's Affidavits.

### Challenge to Secretary's Determination of Validity

45.     After petitions were submitted to the Secretary of State's office, the Secretary reviewed them to determine whether a sufficient number  of valid elector signatures had been submitted to place the Ballot Initiative on the November 3, 2026 general election ballot.

46.     On March 17, 2026, the Secretary issued her Determination validating 71,033 elector signatures.  Because the number of valid signatures as determined by the Secretary was above the 67,682 threshold, the Secretary authorized the placement of the Ballot Initiative on the general election ballot for November 3, 2026.

47.     On March 27, Jane Gilbert, Mark Sayre, and Kaitlin Webber ("the Petitioners") appealed the Secretary's March 17 Determination to Superior  Court.

48.     Among other challenges, Petitioners contested petitions circulated by Circulators Cairo, Hakeem, Chekwuma and Jordan on the grounds that they had failed to check the Jurisdiction Box on their Circulator's  Affidavits.

49.     Aside from the failure of Circulators Cairo, Hakeem, Chekwuma and Jordon to check the Jurisdiction Box, the Petitioners did not assert that any of these four circulators engaged in improper conduct or that any of the elector signatures on the petitions they submitted were otherwise invalid either individually or collectively.

11

50.     In her April 17, 2026, brief to the Superior Court agreed with the Petitioners that the petitions submitted by Circulators Cairo, Hakeem, Chekwuma and Jordan were invalid because they failed to check the Jurisdiction Box.  The Secretary concluded that all the 1,520 elector signatures on all the petitions they circulated must be invalidated.  In taking this action, the Secretary relied on authority that she attributed to the Consent Order.  Other than their failure to check the Jurisdiction Box, the Secretary made no findings that Circulators Cairo, Hakeem, Chekwuma or Jordan had engaged in any wrongful conduct or that any of the signatures on their petitions, either individually or collectively were otherwise invalid.

51.     In the Secretary's April 17, 2026 brief, the Secretary acknowledged the possibility that, during the judicial review of the Secretary's March 17 Determination, Circulators Cairo, Hakeem, Chekwuma and Jordan, individually or together, might seek to address their failure to check the Jurisdiction Box by checking the Jurisdiction Box in the Circulator's Affidavit Form and submitting it to the Secretary.  Having raised this possibility, the Secretary took no position on whether that action would be effect to cure the disqualified circulators' failure to do so earlier.

52.     Because the Secretary was involved in drafting the Consent Order and because her approval was essential before it could be presented to the District Court, her failure reject out of hand the possibility that if a circulator checked the Jurisdiction Box at that point, that circulator would have complied with the Consent Order.

53.     The Secretary's indecision on this question was, moreover, fully consistent with the terms of the Consent Order which, as has been set forth above, lacked any requirements as to when and in what form an out-of-state circulator might signify his or her agreement to submit or be required to do so.

54. On April 17, Cairo submitted an affidavit to the Superior Court whereby she advised under oath that she consented to the jurisdiction of the State of Maine.

55. On April 24, the Superior Court issued an initial decision upholding the Secretary's positions in all respects, but remanding the matter to the Secretary for an evidentiary hearing.

56. The Secretary scheduled the evidentiary hearing for May 12 and appointed a designee to serve as the Hearing Officer.

57. As the May 12 hearing approached, neither the Petitioners nor the Secretary (through the Hearing Officer) asked Circulators Cairo, Hakeem, Chekwuma or Jordan to appear. The reason the Secretary and the Petitioners did not ask Circulators Cairo, Hakeem, Chekwuma and Jordan to appear is because, aside from their failure to check the Jurisdiction Box, they did not challenge their conduct as circulators and they did not challenge any of the elector signatures they gathered, either individually or collectively.

58. On May 6, 2026, Cairo submitted a Circulator's Affidavit, sworn under oath, wherein she checked the Jurisdiction Box a Circulator Affidavit Form. Attachment C.

59. On May 12, 2026, at the Committee's request, Cairo appeared at a hearing by Zoom and, under oath. She confirmed her agreement to submit to the jurisdiction of the State of Maine and authenticated her signature on the May 6, 2026, Circulator's Affidavit and that she, herself, had checked the Jurisdiction Box.

60. Counsel for the Petitioners and the Secretary questioned Cairo about her failure to sign the Jurisdiction Box earlier but did not question her about her conduct as a circulator or the validity of the elector signatures she gathered.

13

61.    Aside from their failure to check the Jurisdiction Box, the Secretary and the Petitioners have not questioned the conduct Circulators Hakeem, Chekwuma and Jordan or the validity of any of the signatures they gathered.  The Secretary has never asked Circulators Hakeem, Chekwuma or Jordan to respond to questions about their circulator work or the signatures they gathered.

**Secretary's Determination of Invalidity-Superior Court Affirmance**

62.  On May 23, 2026, the Hearing Officer issued a Recommended Decision which recommended that the Secretary invalidate all the signatures of out-of-state circulators who failed to check the Jurisdiction Box, including Cairo.  The Recommended Decision recommended that the Secretary reject Cairo's completion of the May 6 Circulator's Affidavit because Cairo had failed to comply with the Consent Order and because, although the Consent Order, did not impose any time limit for checking the Jurisdiction Box and although Paragraph 2(a) of the Consent Order did not refer to any Maine statute, nonetheless, Maine statutory law, 21-A M.R.S. § 903-A(4), controlled the Consent Order and required that the Jurisdiction Box be checked "at the time the petition is filed."

63.  On May 26, 2026, the Secretary issued a Final Decision in which she accepted the Recommended Decision *in toto,* including the Recommended Decision's reliance on the Consent Order to invalidate all the otherwise  valid signatures collected by four out-of-state circulators, including Cairo, who failed to check the Jurisdiction Box.

64.  By accepting the Recommended Decision to disqualify all the signatures gathered by four out-of-state circulators who failed to check the Jurisdiction Box, the Secretary invalidated 1,520 otherwise valid elector signatures.  If the Secretary had not invalidated these 1,520 elector signatures, the number of valid signatures would have remained above the threshold level of

14

67,682 and the Ballot Initiative would have remained on the November 3, 2026 general election ballot.

65. By Decision and Order dated June 11, 2026, the Superior Court upheld the Secretary's Final Decision in its entirety. Attachment D ("Superior Court Decision").

66. In upholding the Secretary's invalidation of all the signatures gathered by the out-of-state circulators who had failed to check the Jurisdiction Box, the Superior Court Decision ruled as follows:

    A. that "the Consent Order authorizes Maine to impose the residency and registration restrictions set forth in article IV, part 3, § 20 of the Maine Constitution <u>only</u> in circumstances in which the circulator fails to consent to Maine's jurisdiction." *Id.*, 7, citing 519 F. Supp.3d 13, *aff'd*, 40 F.4th 1 (underscore in Decision and Order).

    B. that , "[r]ather than contradict the Maine Constitution's prohibition against out-of-state circulators, the Consent Order narrows the scope of the [Maine] constitutional provisions [excluding out-of-state] circulators who fail to consent [to the State of Maine's jurisdiction]. *Id.* at 7;

    C. that "the federal court simply tailored the scope of its injunction to those out-of-state circulators who conduct can be properly regulated by the State: those who fail or refuse to consent to Maine's jurisdiction." *Id.* at 8 (quoting from Secretary of State's brief);

    D. that, "when the Secretary invalidates signatures collected by circulators who failed to consent to Maine's jurisdiction, the Secretary is "applying the Maine Constitution's existing ban on out-of-state circulators to the one subcategory

of those circulators whom the federal court's injunction still permits her to regulate"; *Id.* at 8.

E. that, although the Consent Order lacked any deadline by which an out-of-state circulator had to check the Jurisdiction Box and although the Consent Order did not refer to any Maine statutes, the Consent Order nonetheless required out-of-state circulators to check the Jurisdiction Box in accordance with 21-A M.R.S. § 903-A(4). *Id.* at 9;

F. that Cairo was disqualified from curing her failure to check the Jurisdiction Box earlier because Cairo had" affirmatively decided" not to do so earlier; *Id.* at 8-9

G. that,"[p]ursuant to the Consent Order…the Secretary is enjoined from enforcing the original scope of the residency and registration requirements found in art. IV, pt. 3, § 20 of the Maine Constitution against any out-of-state circulator who consents to Maine's jurisdiction. *Id.* at 10, citing 519 F. Supp.3d 3, 53 (D. Me. 2021); 40 F.4th 1, 20 (1st Cir. 2022); and,

H. that, "as the injunction comes by order of federal court, it is undisputed that the Secretary is bound by the permanent injunction and must act in accordance with the Consent Order. *Id*. at 10 (emphases supplied).

67. On June 11, 2026, the Committee appealed the state law aspects of the Superior Court's affirmance of the Secretary's Final Decision to the Law Court where the appeal remains pending.

## COUNT I
### (Limits of Consent Order)

68.  Plaintiffs repeat and reallege the allegations set forth in Paragraphs 1 through 67 as if set forth fully herein.

69.  This Court expressly recognized the nature of the citizen initiative and referendum powers set forth in the Maine Constitution at Article IV, Pt. 3, §§ 17-22 noting that, "[S]ection 18 [of art. IV, pt. 3] cannot be said to *permit* the direct initiative of legislation upon certain conditions.  Rather, it reserves to the people the *right* to legislate by direct initiative if the constitutional conditions are satisfied." W*e the People PAC,* 519 F.Supp.3d at 20, quoting *McGee v. Sec'y of State*, 2006 ME 50, ¶ 25, 896 A.2d 933 (italics in *McGee*).

70.  This Court found that the *We the People* plaintiffs had shown a "likelihood" that the residency and voter registration requirements as set forth in Maine Constitution, art. IV, pt. 3, § 20 and in Maine statutory law, 21-A M.R.S. § 903-(4)(C) violated the First Amendment. *Id.* at 52.

71.  In ruling on the plaintiffs' preliminary injunction motion, this Court accepted without deciding, the State's representations that the residency and voter registration exclusions were based on procedural integrity and protecting the initiative's grass roots. *Id.* at 46-47. Aside from those proffered interests, this Court said, "[i]t is clear to the Court that one of the purposes of the residency requirement and the 2015 amendment is to keep out-of-state  interest groups out of Maine's political process." *Id.* at 47.

72.  This Court also observed that "[r]egardless of who circulates the petition, the petitions must be signed  by Maine citizens and approved by Maine voters on election day before becoming law." *Id.* at 47.  The Consent Order entered judgment for the Plaintiffs on their claims

17

that the statutory residency and voter registration requirements violated the First Amendment. Attachment A, ¶ 1.

73.    The exclusion of out-of-state petition circulators provided by the Maine Constitution, art. IV, pt. 3, § 20, and Maine statutory law, 21-A M.R.S. § 903-A(4)(C), was and remains comprehensive, admitting of no exceptions.

74.    The Maine resident and Maine registered voter exclusions in the Maine Constitution and Maine statutory law, being absolute, and were and are not severable.

75.    Nowhere in the District Court decision or in the First Circuit affirmance does it appear that  the Secretary claimed that the residence and voter registration terms were severable. Nor does it appear the Secretary asked the courts to sever them from the Maine Constitution and Maine statutory law.  *We the People PAC*, 519 F.Supp.3d 13, *passim*; 40 F4th 1, *passim.*  The Secretary did not make this request because the residence and voter registration conditions are absolute and admit of no exceptions.

76.    Nor can a court tailor or selectively limit the application such terms through injunctive relief. *Cf., Ayotte v.  Planned Parenthood of Northern New England,* 546 U.S. 320, 328-330 (2006) (some mandatory reporting requirements valid; some mandatory reporting requirements invalid).

77.    The Consent Order barred the Secretary from enforcing the residence and voter registration.  Attachment A, ¶¶ 2-3.

78.    The Consent Order did not repeal or amend residency and voter registration requirements in the Maine Constitution and in Maine statutory law.  The Consent Order left them wholly intact but ordered the Secretary not to enforce them. See, *Pool v. City of Houston*, 978 F.3d 307,  309 (5th Cir. 2020) ("Courts hold laws unenforceable; they do not erase them."); see

18

also, *We the People PAC*, 519 F.Supp.3d at 49, n. 31 (discussing *Pool v. City of Houston*, noting the City of Houston's characterization of its residence and voter registration limitations on petition circulation as a "zombie law").

79.    In approving subparagraph 2(a)-(c) of the Consent Order, this Court did not intend and did not invest the Secretary with the authority to exercise affirmative powers that denied to her by the residency and voter registration exclusions in the Maine Constitution and Maine statutory law. Nor did Consent Order intend to empower the Secretary to exercise authority to circumvent the absolute residency and voter registration exclusions in the Maine Constitution or Maine statutory law.

80.    In approving subparagraphs 2(a)-(c), the Consent Order did not "narrow the scope" of the Maine Constitution's residency and voter registration exclusions.

81.    In approving subparagraphs 2(a)-(c),  the Consent Order did not intend to supplant the authority of Maine voters or, as appropriate, their elected representatives to adopt conditions under which out-of-state circulators could circulate initiative and referenda petitions in Maine including their authority to decide that the current conditions generally applicable to Maine circulators required no such supplementation.

82.    Notwithstanding the Consent Order's limitations as aforesaid, the Secretary is improperly relying on the Consent Order's purported authority to invalidate the petitions circulated by Circulators Cairo, Hakeem, Chekwuma and Jordan on the grounds that they failed to check the Jurisdiction Box and, thereby, to invalidate the otherwise valid signature of 1,520 Maine electors.

## COUNT II
### (Limits of this Court's Remedial Powers)

83.     Plaintiffs repeat and reallege the allegations set forth in Paragraphs 1 through 82 above as if fully set forth herein.

84.     This Court's injunctive powers include the authority to prohibit state officials from exercising authority inconsistent with and violative of the United States Constitution, federal statutes, federal rules and regulations.

85.     This Court's injunctive powers also include the authority to issue mandatory injunctions stating with particularity affirmative acts a party or parties are to perform.

86.     This Court's injunctive powers do not include authorizing state officials to exercise affirmative authority with respect to particular aspects of state action.

87.     Subparagraphs 2(a)-(c) of the Consent Order are not prohibitory and they lack the specificity required for mandatory injunctions and they do not meet any other mode or means of relief this Court is authorized to exercise.

88.     Subparagraphs 2(a)-(c) as set forth in the Consent Order and as to the powers that the Secretary claims they invested her are beyond the powers of this Court.

## COUNT III

89.     Plaintiffs repeat and reallege the allegations set forth in Paragraphs 1 through 88 above as if fully set forth herein.

90.     The Secretary advised this Court and the First Circuit Court of Appeals that the State had the authority to issue subpoenas to out-of-state circulators. *We the People PAC*, 519 F. Supp.3d at 47 ("Defendants…have failed to show how a requirement that petition circulators enter into a binding agreement to submit to Maine's jurisdiction and comply with any **subpoenas** would be inadequate: (emphasis supplied); *We the People PAC*, 40 F.4th at 20 ("For that reason,

20

the Defendants, even though Maine **could subpoena** out-of-state circulators, that option is 'hardly a realistic' one for the Secretary to exercise during the thirty day petition review period." (emphasis supplied)

91.     If a person who has been properly subpoenaed fails to comply with that subpoena, that person can be sanctioned by a court, including held in contempt. See. Rule 66(a)(2)(ii), Me. R. C. Pro. (defining "contempt").

92.     Thus, the Secretary gave this Court and the First Circuit the clear impression that if out-of-state circulators submitted to Maine's jurisdiction, they would become subject to Maine's subpoena powers and that if they failed to comply with the subpoena, they, themselves, would be subject to sanction, including contempt.

93.     In the week before the May 12 hearing, the Petitioners asked the Secretary, though her designee, the Hearing Officer, to issue subpoenas to three out-of-state circulators, all of whom had checked the Jurisdiction Box.

94.     The Hearing Officer responded to the Petitioners' request by advising that the Secretary, in consultation with the Deputy Attorney General, had determined that, by operation of 5 M.R.S. § 9060, she was barred from issuing subpoenas to out-of-state circulators for the May 12 hearing.  She advised that she was only empowered to issue letters to the out-of-state circulators.

95.     Accordingly, the Hearing Officer issued letters the three out-of-state circulators whom the Petitioners had sought to subpoena.  In her letter, the Hearing Officer advised the out-of-state circulators that they were requested to appear at the May 12 hearing.  Her letter also advised them that the sole sanction the Hearing Officer could impose in the event they failed to

comply would be to invalidate the petitions they had circulated and submitted and all the elector signatures on them.  Attachment E.  All three circulators appeared at the May 12 hearing.

96.    On information and belief,  at no point since the Secretary has determined that she cannot issue subpoenas to out-of-state circulators who have consented to the State's jurisdiction has she advised this Court that she has reached this legal conclusion.

97.    On information and belief, at no point since the Secretary has determined that she cannot issue subpoenas to out-of-state circulators who have consented to the State's jurisdiction has she advised this Court that her only remedy for sanctioning noncompliant circulators is to invalidate the elector signatures on the petitions those circulators submitted to the Secretary.

98.    Information and belief, at no point has  the Secretary advised this Court that she is relying on this Court's Consent Order to invalidate 1,520 signatures of Maine electors to bar the Ballot Initiative from the November 3, 2026 general election ballot..

99.    The Consent Order was not intended to and did not give the Secretary the authority to invalidate otherwise valid elector signatures because an out-of-state circulator failed to check the Jurisdiction Box which the Secretary included on the Circulator's Affidavit Form under the authority of subparagraphs 2(a)-(c) of the Consent Order.

**COUNT IV**

100.    Plaintiffs repeat and reallege the allegations set forth in Paragraphs 1 through 99 as set forth above as if fully set forth herein.

101.    This Court's initial preliminary injunction provided that out-of-state circulators would "first" consent to jurisdiction.  *We the People PAC*, 519 F. Supp.3d at 53.

22

102.    Subparagraph 2(a) of the Consent Order, which the Secretary necessarily reviewed and approved, omitted the word "first" and did not replace it with any other timing condition.  Attachment A, ¶ 2(a).

103.    Subparagraphs 2(b) and 2(c) of the Consent Order were tied to the "duration of the petition drive" as described in subparagraph 2(b) but this phrase did not appear in subparagraph 2(a).  *Id.,* ¶¶ 2(b)-(c).

104.    Because subparagraph 2(a) contains no timing conditions or deadlines for manifesting "agreement" with the State's jurisdiction, long as an out-of-state circulator complies with proper requests to participate in the Secretary's review of petitions, including the entirety of any judicial review attendant to that review process, that out-of-state circulator has complied with subparagraph 2(a).irrespective of whether that circulator had previously affirmatively confirmed his or her consent to the Secretary on a Circulator's Form or otherwise.

105.    In sum, subparagraph 2(a) merely provides that the Secretary is enjoined from enforcing the residency requirement against circulators who agree to submit to the State's jurisdiction. As Cairo experience demonstrates, a failure to check the Jurisdiction Box does not constitute a refusal to consent.  A refusal to consent, even as to those who have checked the Jurisdiction Box, only becomes effective when the Secretary asks an out-of-state circulator to respond or appear at a hearing and that circulator fails to respond or expressly refuses to comply.

106.    Thus, if the Secretary or another party to the review process does not request the presence or participation of an out-of-state circulator who has not previously confirmed his  or her consent to the Secretary on a Circulator's Form or otherwise, then that circulator has complied with subparagraph 2(a) irrespective of whether that circulator previously confirmed his or her consent to the Secretary on a Circulator's Form or otherwise.

23

107.    In addition, Paragraph 1 of the Consent Order entered judgment for the We the People plaintiffs on Counts I-IV of their complaint which alleged that the statutory residence and voter registration exclusions violated the First Amendment.  Attachment A, ¶ 1.

108.    While providing that the Secretary was enjoined from applying the residency exclusion to out-of-state circulators who agreed to submit to Maine's jurisdiction, the Consent Order did not, thereby, authorize the Secretary to enforce that restriction, adjudged unconstitutional in Paragraph 1 of the same Consent Order, against out-of-state circulators who did not agree to submit.

WHEREFORE, Plaintiffs pray this Court to declare as follows:

A.  That Paragraph 1 of the Consent Order entered judgment that the residency requirement in Maine statutory law violated the First Amendment to the United States Constitution and Paragraph 2 of the Consent Order did not authorize any State official, including the Secretary of State, to apply the residency exclusion against any out-of-state circulator who did not affirmatively manifest an agreement to consent to the State of Maine's jurisdiction;

B.  That the provisions set forth in subparagraphs 2(a)-(c) have not been authoritatively adjudicated by the Supreme Court, the First Circuit Court of Appeals, or this Court has consistent with the First Amendment to the United States Constitution; such an adjudication could only be issued if some or all of the provisions in subparagraphs 2(a)-(c) were enacted into law by a duly authorized legislative body, subjected to a formal First Amendment challenge, and adjudicated to be consistent with the First Amendment;

24

C. That no part of the Consent Order authorized or empowered the Secretary of State to exercise powers inconsistent with the Maine Constitution and Maine statutory law, including the residency provisions in art. IV, pt. 3, § 20 and 21-A M.R.S. 903-A(4)(C) and, further, this Court is not empowered to authorize the Secretary exercise powers inconsistent with the Maine Constitution or Maine statutory law;

D. That the Secretary represented to this Court and to the First Circuit that, if an out-of-state circulator consented to the State's jurisdiction, that out-of-state circulator would be subject to the State's subpoena power and that persons who are subject to lawful subpoenas may, themselves, be held to account in contempt proceedings but the Secretary did not advise this Court or the First Circuit that, in the Secretary's administrative proceedings, the Secretary could not subpoena out-of-state circulators even if they had agreed to submit to the State's jurisdiction. With this background, the Consent Order did not authorize the Secretary to invalidate the otherwise valid signatures of Maine electors on initiative or referenda petitions and any actions taken by the Secretary based on the assumption that the Consent Order provided the Secretary with such powers are null and void *ab initio* and of no force of effect.

E. The Consent Order did not provide any time period by which an out-of-state circulator should signify that circulator's agreement to submit to the State's jurisdiction nor did it specify the means by which the out-of-state circulator should do so. The Secretary did not ask Circulator Cairo to cooperate in the Secretary's review of the Ballot Initiative petitions nor did the Petitioners in that proceeding. Circulator Cairo's submission of a Circulator's Affidavit with the Jurisdiction Box checked

25

before the May 12 hearing and her appearance by Zoom at that hearing satisfied subparagraph 2(a) of the Consent Order and all other aspects of the Consent Order. To the extent the Secretary relied on subparagraph 2(a) or any other aspect of Consent Order to invalidate Circulator Cairo's petitions and all the otherwise valid elector signatures on those petitions, this Court hereby declares the Secretary's determination to be null and void *ab initio* and of no force and effect.

F.  The Consent Order did not require out-of-state circulators Cairo, Ummsalaamah Hakeem, Kewechi Chekwuma, or Albert Jordan to check the Jurisdiction Box on their Circulator's Affidavit.  As long as they responded to the Secretary's requests to comply with her investigation, they complied with the Consent Order.  Since the Secretary did not ask any of them to cooperate in her investigation and because neither the Secretary nor the Petitioners questioned the validity of any of the signatures they gathered, to the extent the Secretary relied on subparagraph 2(a) or any other aspect of Consent Order to invalidate the petitions of Circulator Cairo, Hakeem, Chekwuma, and Jordan and the otherwise valid elector signatures on those petitions, this Court hereby declares the Secretary's determination to be null and void *ab initio* and of no force and effect.

G.  The Consent Order is hereby modified, *nunc pro tunc* to February 9, 2023, to strike subparagraphs 2(a)-(c) and to read as follows:  Defendants are permanently enjoined from enforcing 21-A M.R.S. § 903-A and Me. Const. art IV, pt. 3, § 20 to the extent they require that initiative or people's veto petitions only be circulated by Maine residents.

Dated: June 30, 2026

/s/ Carl Woock.
Stephen C. Smith, Esq. (ME #8720)
John E. Baldacci, Esq. (ME # 5773)
Carl E. Woock, Esq. (ME #5657)
**STEVE SMITH TRIAL LAWYERS**
191 Water Street
Augusta, ME 04330
(207) 622-3711
info@americantrialgroup.com