UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| CAIRO, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 2:26-cv-00335-SDN |
| | ) | |
| SHENNA BELLOWS, *Secretary of State, State of Maine*, | ) | |
| | ) | |
| | ) | |
| Defendant. | | |

**ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION**

Plaintiffs Cairo—a resident of Texas and professional "circulator" of ballot initiative petitions—and three Maine voters (collectively, "the Plaintiffs") petition this Court for a preliminary injunction enjoining Defendant Shenna Bellows, in her official capacity as Secretary of State, from enforcing Maine's statutory and constitutional voter registration and residency requirements against out-of-state circulators. For the reasons that follow, the court **DENIES** the Plaintiffs' motion for injunctive relief.

**PROCEDURAL AND FACTUAL BACKGROUND**[1]

This matter comes before the Court following a lengthy procedural history—winding through prior federal litigation, state administrative decisions, and now finally a ruling from Maine's highest court.

**I. *We the People PAC v. Bellows***

On December 31, 2020, We the People PAC and several other plaintiffs filed a federal civil action against Secretary of State Bellows, challenging residency and voter

[1] The Court recites factual allegations from the Plaintiffs' Verified Amended Complaint, ECF No. 29, and assumes their truth for the purposes of this Order. *See Alcom, LLC v. Temple*, No. 20-cv-00152, 2020 WL 2202443, at *1 n.1 (D. Me. May 6, 2020).

registration restrictions established in the Maine Constitution and state law—namely the requirement that "circulators" of ballot initiative petitions be citizens of Maine. *See We the People PAC v. Bellows*, 519 F. Supp. 3d 13 (D. Me. 2021) ("*We the People I*")[2]; *see also* 21 M.R.S. § 903-A(4)(C) (requiring circulators to execute an affidavit affirming they are "a resident of the State and a registered voter in the State at the time of circulating the petition"); Me. Const. art. IV, pt. 3, § 20 (Maine constitutional provision requiring circulators be residents and registered voters in Maine). Plaintiffs in that case argued the residency and voter registration requirements violated the First Amendment and sought a preliminary injunction barring the enforcement of state law restricting out-of-state circulators from circulating petitions. *We the People I*, 519 F. Supp. 3d at 33–34. On February 16, 2021, Judge Woodcock found the plaintiffs had demonstrated a likelihood of success on the merits of their First Amendment claims, reasoning the Secretary had "failed to show how a requirement that petition circulators enter into a binding agreement to submit to Maine's jurisdiction and comply with any subpoenas" would be inadequate to protect both the State's interest in election regulation and integrity and the plaintiffs' constitutional rights. *Id.* at 47. The Court enjoined enforcement of 21 M.R.S. § 903-A to the extent it required that petitions be circulated by either a registered voter or resident of the State of Maine, effectively opening the door to "out-of-state circulators who first submit to the jurisdiction of the state of Maine" for any potential investigation or prosecution arising from their political activity as circulators. *Id.* at 53.

---

[2] For purposes of clarity, the Court will refer to the District Court's decision in *We the People PAC v. Bellows*, 519 F. Supp. 3d 13 (D. Me. 2021) as "*We the People I*" and the subsequent First Circuit decision affirming the District Court's decision in *We the People PAC v. Bellows*, 40 F.4th 1 (1st Cir. 2022) as "*We the People II*."

On July 7, 2022, the First Circuit affirmed the District Court's decision in its entirety. *We the People PAC v. Bellows*, 40 F.4th 1 (1st Cir. 2022) ("*We the People II*"). In so holding, the court found nothing to indicate "a better fit [] between the interest in election integrity that Maine asserts" and the residency requirement "at least as that requirement is applied to out-of-state circulators who first submit to the jurisdiction of State of Maine' for alleged violations of Maine law." *Id.* at 20 (quotation modified).[3] Following the First Circuit's affirmance, the parties drafted a Consent Order, that Judge Woodcock approved on February 9, 2023. *See* ECF No. 12 ("Consent Order"). Relevant here, the Consent Order permanently enjoined the Secretary from enforcing 21 M.R.S. § 903-A and the related constitutional provision against circulators who agree to "submit to the personal jurisdiction of Maine for purposes of any investigation or prosecution of any alleged violation of Maine law" with respect to lawsuits arising from their conduct as circulators. *Id.* at 1–2. The Consent Order left unspecified both the manner in which circulators must affirmatively submit to Maine's jurisdiction and the required timeline for doing so.[4] Following the entry of the Consent Order, the Secretary amended the

---

[3] In *We the People II*, the Secretary had argued that allowing out-of-state circulators to circulate petitions unduly burdened "Maine's interest in the integrity of its elections," because such interest extended to "being able to quickly and efficiently contact circulators" to investigate potential voter fraud, and because the State subpoenaing out-of-state circulators was "hardly a realistic" option given the applicable thirty-day petition review deadline. *We the People II*, 40 F.4th at 20. In rejecting this argument, the court noted that Maine law already requires circulators to disclose the physical address at which they reside, keep up-to-date contact information with the Secretary's office, and affirmatively submit to the jurisdiction of Maine. *Id.* On these facts, the court concluded that Defendants could not explain why in-state circulators "are so much easier to contact than [out-of-state] circulators that a flat-out ban on out-of-staters is necessary." *Id.*

[4] The full provision of the Consent Order at issue here, Paragraph 2, reads as follows:

Defendants are permanently enjoined from enforcing 21-A M.R.S. § 903-A and Me. Const., art. IV, pt. 3, § 20, to the extent they require that initiative or people's veto petitions only be circulated by Maine residents, against circulators who (a) agree to submit to the personal jurisdiction of Maine for purposes of any investigation or prosecution of any alleged violation of Maine law with respect to initiative or people's veto petitions; (b) maintain up-to-date contact information with

standard circulator affidavit to include a mechanism for out-of-state circulators to indicate their affirmative consent to the jurisdiction of Maine. *See* ECF No. 29 ¶ 39; ECF No. 36-2 ¶¶ 5–8 (Julie Flynn Declaration). Specifically, she amended the standard affidavit to include a box—the "Jurisdiction Box"—for out-of-state circulators which reads, in relevant part: "I agree to submit myself to the jurisdiction of the State of Maine for any investigation or prosecution for any alleged violation of Maine law with respect to initiative or people's veto petitions." *See* ECF No. 13 (Standard Circulator Affidavit). By checking the Jurisdiction Box, out-of-state circulators effectively indicate they affirmatively submit to the jurisdiction of Maine for any suits arising out of their political conduct as circulators within the State of Maine.

## II. "Protect Girls' Sports in Maine" Ballot Initiative

Fast forward to 2025, where Protect Girls' Sports in Maine ("PGS"), a registered Ballot Question Committee, and Plaintiffs in this case sought to place a ballot initiative entitled "An Act to Designate School Sports Participation and Facilities by Sex" ("the Ballot Initiative") on the November 3, 2026, general election ballot. *See* ECF No. 29 ¶ 11. To qualify for placement on the ballot, the Ballot Initiative needed to secure valid signatures from Maine electors equal to at least 10% of the total vote cast in the gubernatorial election preceding the filing of its petition. *See* Me. Const. art. I, pt. 3, § 18. For the 2026 general election ballot, that threshold was 67,682 valid signatures. ECF No. 29 ¶ 12. Plaintiff Cairo, a "professional petition circulator[]," was "retained to circulate

---

the Maine Secretary of State's office, by whatever means identified by the Secretary of State's office, for the duration of any petition drive for which they circulation petitions, which drive includes the collection of signatures and review of those signatures by the Secretary of State's office; and (c) are responsive to requests for information from the Secretary of State's office for the duration of the petition drive, as defined above. ECF No. 12 at 1–2.

petitions to Maine electors to obtain signatures in support of the Ballot Initiative." *Id.* ¶ 44. At all times Cairo circulated petitions for the Ballot Initiative, Cairo was neither a registered Maine voter nor Maine resident. *Id.* ¶ 45. On December 12, 2025, Plaintiffs Jason McNeill and Matt Couture each signed a petition circulated by Cairo to place the Ballot Initiative on the November 3, 2026, general election ballot. *Id.* ¶¶ 46–47.[5] On February 2, 2026, Cairo, along with other out-of-state circulators, submitted their petitions containing signatures to the Secretary of State alongside their Circulator's Affidavits—but each failed to check the Jurisdiction Box on the Affidavit. *Id.* ¶¶ 50–51. On March 17, the Secretary, following her review of all submitted petitions, issued her initial Determination validating 71,033 elector signatures, and authorized placement of the Ballot Initiative on the November general election ballot. *Id.* ¶ 53.

## III. State Court Litigation[6]

On March 27, 2026, individuals Jane Gilbert, Mark Sayre, and Kaitlin Webber ("the Intervenors") appealed the Secretary's Determination to the Maine Superior Court, contesting petitions submitted by Cairo and three other out-of-state circulators on the basis that they had failed to check the Jurisdiction Box on their affidavits. ECF No. 29 ¶¶

---

[5] On November 3, 2025, Plaintiff Sofia Pride also signed a petition circulated by a non-plaintiff to place the Ballot Initiative on the November 3, 2026, general election ballot. ECF No. 29 ¶ 49.

[6] In this federal action, Plaintiffs are Cairo and three Maine voters—McNeill, Couture, and Pride—while Gilbert, Sayre, and Webber appear as Intervenors. In the state court litigation, Gilbert, Sayre, and Webber were the Plaintiffs-appellants. Protect Girls' Sports in Maine ("PGS") intervened in the state court litigation on appeal from the Secretary's Determination and is not itself a party to this federal action—though, as discussed *infra* Section I.C, Plaintiffs here are represented by the same counsel who represented PGS in state court. Cairo participated in the state proceedings as a witness and affiant on behalf of PGS, not as a party or intervenor; the record reflects no comparable role for McNeill, Couture, or Pride in that litigation. The Secretary of State was the Defendant or respondent in both matters. The significance of these differing roles for purposes of privity is addressed *infra* Sections I.C & I.D.

54–55.[7] On April 17, the Secretary submitted her brief to the Superior Court, taking the position for the first time that the 1,520 elector signatures on petitions obtained by out-of-state circulators who had not checked the Jurisdiction Box were in fact invalid and should not have been counted toward the Ballot Initiative's signature threshold. *Id.* ¶ 57. That same day, Cairo submitted an affidavit to the Superior Court in which she advised under oath that she consented to the jurisdiction of the State of Maine. *Id.* ¶ 61. On April 24, the Superior Court issued an initial decision, agreeing with the Secretary's new position and remanding the matter to her for an evidentiary hearing on the validity of the disputed signatures. *Id.* ¶ 62.

On May 6, 2026, Cairo submitted a revised affidavit in which she checked the Jurisdiction Box. *Id.* ¶ 66; *see* ECF No. 14 (Cairo Circulator's Affidavit, May 6, 2026). On May 12, Cairo appeared at the evidentiary hearing via Zoom and confirmed under oath her agreement to submit to the jurisdiction of Maine, authenticated her signature on the Affidavit, and testified that she herself had checked the Jurisdiction Box. ECF No. 29 ¶ 67. Plaintiffs note that during the hearing, counsel for the Intervenors and the Secretary confined their examination of Cairo to her failure to check the Jurisdiction Box on her initial petition and declined to question her further regarding her conduct as a circulator or the validity of the elector signatures she gathered. *Id.* ¶ 68. During the hearing, PGS petitioned the Secretary to reconsider her position that the contested signatures were not valid, in part arguing that Cairo's belated May 6, 2026, affidavit in which she checked the

[7] On April 1, 2026, the Ballot Question Committee "Protect Girls' Sports in Maine" ("PGS") moved to intervene in the Maine Superior Court litigation, and on April 13, the Superior Court granted its motion. *Gilbert v. Sec'y of State*, 2026 ME 59, at ¶ 3, 2026 WL 1993411, (Me. July 10, 2026).

Jurisdiction Box constituted her compliance with the *We the People I* Consent Order's consent-to-jurisdiction requirement. *See* ECF No. 36-9 at 34.

On May 23, 2026, the Hearing Officer issued a Decision recommending the Secretary invalidate all signatures on petitions circulated by out-of-state circulators—including Plaintiff Cairo—who had failed to check the Jurisdiction Box at the time of submission. ECF No. 29 ¶ 70. Although the Consent Order imposed no specific time limit for checking the Jurisdiction Box, the Hearing Officer reasoned that 21 M.R.S. § 903-A(4) controlled the Consent Order and thus required the Jurisdiction Box be checked "at the time the petition is filed." *Id.*; *see* 21 M.R.S. § 903-A(4) ("The circulator shall file the affidavit with the Secretary of State *at the time the petition is filed.*") (emphasis added). Based on Cairo's testimony, the Hearing Officer concluded Cairo's failure to check the Jurisdiction Box "was, at the time she submitted the [circulator] affidavit, *not* an inadvertent failure to express her agreement to the terms on the affidavit, but a substantive lack of agreement to those terms." ECF No. 36-9 at 36 (emphasis in original). On May 26, the Secretary issued a Final Decision accepting the Recommended Decision in its entirety, invalidating 1,520 elector signatures and reducing the total valid signatures supporting the Ballot Initiative to 67,150—below the constitutionally mandated threshold of 67,682 signatures. ECF No. 29 ¶¶ 13, 71. Absent the Secretary's Final Decision invalidating those signatures, the number of valid signatures would have remained above the threshold level, and the Ballot Initiative would have remained on the November 3, 2026, general election ballot. *See id.* at ¶ 72.

PGS subsequently appealed the Secretary's May 26, 2026, Final Decision invalidating the 1,520 elector signatures. ECF No. 36-15 at 21–43. On June 11, 2026, the Maine Superior Court upheld the Secretary's Final Decision. ECF No. 29 ¶ 73; *see* ECF

No. 15 (Maine Superior Court decision). The Superior Court sustained "the Secretary's determination that signatures collected by Cairo should be invalidated regardless of her corrected affidavit dated May 6, 2026 in which she after-the-fact consented to Maine's jurisdiction," noting the record demonstrated that, at the time of the initial submission of the petition to the Secretary, "Cairo affirmatively decided to leave the [J]urisdiction [B]ox blank on her circulator affidavit due to unresolved questions about the implications of such consent." ECF No. 15 at 8.

On appeal, the Maine Law Court affirmed the Superior Court's ruling. *Gilbert v. Sec'y of State*, 2026 ME 59, 2026 WL 1993411 (Me. July 10, 2026). In upholding the Secretary's decision to invalidate the signatures based on the circulators' failure to check the Jurisdiction Box, the Law Court held the Secretary "was not only authorized but was constitutionally bound to impose and enforce the [jurisdiction] oath requirement." *Id.* ¶ 12. The Court further concluded the requirement that circulators affirmatively consent to the jurisdiction of Maine, the consent-to-jurisdiction requirement, was "not . . . a novel rule created by the Secretary without enabling authority," but rather represented the Secretary "complying with the Maine Constitution and Maine statutes to the extent not precluded by federal restrictions." *Id.* ¶ 26. Finally, the Court determined the requirement that the Jurisdiction Box on the Affidavit be checked at the time of submission complied with 21 M.R.S. § 903-A(4), was both reasonable and nondiscriminatory, not otherwise precluded by federal law, and furthered important state interests, such as the Secretary's "ability to fulfill her duties" in determining petition validity. *See id.* ¶¶ 31–34.

### IV. Instant Federal Action

Separate from the *Gilbert* state court litigation, Plaintiffs filed the instant action on June 30, 2026, seeking primarily declaratory relief and requesting retroactive

modification of the Consent Order "to deny the Secretary any claim to the powers she has arrogated to herself through her misinterpretation and misapplication of the Consent Order." ECF No. 1 at 3. On July 17, 2026, Plaintiffs filed their verified amended complaint, seeking in part declaratory judgment as to the "meaning and terms" of the Consent Order (Count I) and as to the "nature and limits of federal court remedial power" (Count II). ECF No. 29 at 17–24. Plaintiffs also assert five additional claims arising from the Secretary's decision to invalidate the signatures: Due Process (Count III), unconstitutional conditions (Count IV), the First Amendment (Count V), Equal Protection as to Plaintiff Cairo (Count VII), and Privileges and Immunities (Count VIII). ECF No. 29 at 24–32.[8] Plaintiffs also ask this Court to find the Consent Order does not apply to Plaintiff Cairo, *see id.* at 21, and that the *We the People I* court exceeded its federal remedial powers in issuing the Consent Order, *see id.* at 24.

Plaintiffs subsequently moved for a preliminary injunction, seeking to bar the Secretary "from enforcing the Consent Order against Plaintiff Cairo and to direct the Secretary to reverse any and all decisions adverse to" the Plaintiffs' interests. ECF No. 30 at 1. On July 30, 2026, both the Secretary and the Intervenors filed responses opposing the Plaintiffs' motion. ECF Nos. 35 & 36. The Secretary argues Plaintiffs lack both Article III standing to pursue their claims and any legal basis to seek enforcement of the Consent Order. *See* ECF No. 36 at 6–12. She further argues Plaintiffs have no likelihood of success on the merits of any of their constitutional claims. *Id.* at 6. Intervenors raise similar arguments but additionally contend the *Rooker-Feldman* doctrine and collateral estoppel

[8] The Plaintiffs' amended complaint contains a clerical error with respect to the numbering of Counts against the Secretary. The complaint lists Counts I through V but then skips to Count VII (Equal Protection) and Count VIII (Privileges and Immunities)—omitting any Count VI. For the purposes of this Order, the Court adopts the Plaintiffs' numbering to avoid any confusion.

each also bar Plaintiffs from relitigating claims already conclusively resolved in the Maine state courts. ECF No. 35 at 12–16.

**DISCUSSION**

To grant a preliminary injunction, the Court must find four elements satisfied: (1) the movant is likely to succeed on the merits, (2) the movant is likely to suffer irreparable harm absent interim relief, (3) the balance of equities favors the movant, and (4) granting relief would serve the public interest. *See Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc.*, 794 F.3d 168, 171 (1st Cir. 2015). Courts award such injunctive relief only as an "extraordinary and drastic remedy"—never as of right. *Carey v. Town of Rumford*, 25-cv-00356, 2025 WL 2978795, at *2 (D. Me. Oct. 22, 2025) (quoting *Calvary Chapel of Bangor v. Mills*, 459 F. Supp. 3d 273, 282 (D. Me. 2020)). District courts accordingly retain wide discretion in judging whether such injunctive relief is appropriate. *Francisco Sánchez v. Esso Standard Oil Co.*, 572 F.3d 1, 14 (1st Cir. 2009).

The likelihood of success on the merits is the "sine qua non" of this inquiry: a plaintiff's failure to demonstrate a likelihood of success on the merits ordinarily disposes of the motion. *See New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002). On this issue the district court need only estimate the likelihood of success; it "need not predict the eventual outcome on the merits with absolute assurance." *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 10 (1st Cir. 2013) (quoting *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996)).

The Court now proceeds in three parts. It first takes up the threshold issues raised by the Secretary and the Intervenors, then turns to the substantive merits of the Plaintiffs' claims—both bearing on Plaintiffs' likelihood of success on the merits—and then finally

addresses the remaining preliminary injunction factors—irreparable harm, the balance of equities, and the public interest.

## I. Threshold and Jurisdictional Barriers to Relief

The Secretary and Intervenors argue that several threshold and jurisdictional defects in the Plaintiffs' amended complaint—Article III standing, this Court's jurisdiction over the Consent Order, the *Rooker-Feldman* doctrine, and collateral estoppel—independently defeat any likelihood of success on the merits of Plaintiffs' claims. The Court now considers each in turn and concludes that these defects foreclose Plaintiffs' entitlement to preliminary injunctive relief.

### A. Standing

The Secretary first challenges Plaintiffs' Article III standing to bring this action, arguing a favorable decision by this Court would not cure or redress the Plaintiffs' purported injury. Justiciability principles require an actual case or controversy before a litigant may pursue a claim in a federal court. *See Ramírez v. Sánchez Ramos*, 438 F.3d 92, 97 (1st Cir. 2006) (citing U.S. Const. art. III, § 2, cl. 1). To establish standing, a plaintiff must show: (i) they "suffered an injury in fact that is concrete, particularized, and actual or imminent"; (ii) the defendant likely caused the injury; and (iii) judicial relief would likely redress the injury. *St. Dominic Acad. v. Makin*, 181 F.4th 11, 28 (1st Cir. 2026) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)). For an injury to be redressable, it must be "likely," not merely "speculative," that a favorable decision will redress it. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (quotation modified).

The Secretary relies primarily on the First Circuit's recent decision in *Taker v. Blanche*, where the plaintiff brought a Second Amendment challenge to federal and state statutes barring him from possessing a firearm. 179 F.4th 96, 98 (1st Cir. 2026). At the

time he filed suit, the *Taker* plaintiff was independently subject to a state court Protection from Abuse ("PFA") Order restricting his possession of certain firearms subject to criminal penalties. *Id.* at 98–99. The plaintiff's complaint sought a declaration that the challenged statutes were unconstitutional and an injunction against their enforcement, but fatally never alleged that the PFA Order was "similarly unconstitutional or otherwise invalid." *Id.* at 99. The First Circuit accordingly held the plaintiff lacked Article III standing: even if the court struck down the statutes, the PFA Order still barred him from possessing a firearm, leaving him without a redressable injury. *Id.* at 102.

Plaintiffs' claims each rest either on the constitutionality of the Secretary's interpretation of the Consent Order, or her actions taken in purported reliance on it. Those actions include the Secretary's creation of the Jurisdiction Box and, based on Cairo's failure to check the Box, the Secretary's resulting invalidation of the signatures. Nothing in Plaintiffs' claims or their prayer for relief, *see* ECF No. 29 at 32–37, purports to challenge the constitutionality of 21 M.R.S. § 903-A(4)(C) or Article IV, pt. 3, § 20 of the Maine Constitution—the very provisions that give the Secretary authority to impose the consent-to-jurisdiction requirement independent of the Consent Order. *See Gilbert*, 2026 ME 59, at ¶ 14. As the Law Court held in affirming the Secretary's decision to invalidate the signatures, the Secretary "was not only authorized but was constitutionally bound to impose and enforce the [jurisdiction] oath requirement." *Id.* ¶ 12. In so holding, the Court found the "requirement that out-of-state circulators consent to jurisdiction is not . . . a novel rule created by the Secretary without enabling authority." *Id.* ¶ 26. Instead, the Secretary's "authority—and her duty—to impose the [jurisdiction] oath comes from the Maine Constitution and her own oath to adhere to its provisions." *Id.*

Because Plaintiffs' claims target the Consent Order and the Secretary's actions taken in reliance thereon, even complete success on those claims would leave the Secretary's independent constitutional and statutory authority untouched. Even assuming the Court were to grant Plaintiffs' requested relief and strike down the Consent Order in its entirety or instead modify it to exclude application of its provisions to Plaintiffs,[9] the *Gilbert* decision and its holding on the Secretary's exercise of authority in creating and enforcing the consent-to-jurisdiction requirement, through the Jurisdiction Box, would remain fully intact. *See id.* ¶ 26. Plaintiffs' claimed injury therefore is not one that "would likely be redressed by judicial relief." *Makin*, 181 F.4th at 28 (quotation modified). The Court accordingly finds that Plaintiffs' lack of a redressable injury renders their Article III standing unlikely—one of several independent grounds, as discussed further below, by which Plaintiffs are unlikely to succeed on the merits of their claims.

### B. Jurisdiction over the Consent Order

As part of their request for declaratory and injunctive relief, Plaintiffs seek*, inter alia*, a declaration that the Consent Order does not apply to them as non-parties to the *We the People* litigation, coupled with an injunction against its enforcement. ECF No. 29 at 32–34. In the same breath, Plaintiffs ask this Court to retroactively modify that same Consent Order—striking the consent-to-jurisdiction requirement and ordering instead "that Defendants are permanently enjoined from enforcing 21 M.R.S. § 903-A and Me. Const. art IV, pt. 3, § 20 to the extent they require that initiative or people's veto petitions only be circulated by Maine residents." *Id.* at 35. Plaintiffs thus ask this Court to both

[9] For the reasons described in the following section, the Court finds, in any event, that it lacks the necessary jurisdiction to amend, modify, or otherwise absolve the Consent Order issued in a separate federal matter.

declare the Consent Order inapplicable to them while also requesting to rewrite it to their preferred terms. The Court need not resolve that obvious tension, however, because it finds multiple jurisdictional issues independently bar it from enforcing or rewriting a consent order entered in a separate federal action.

First, Plaintiffs, as non-parties to the *We the People* action, lack standing to enforce or modify its Consent Order. A consent order or decree[10] "is not enforceable directly or in collateral proceedings by those who are not parties to it, even though they were intended to be benefited by it." *Blake v. Pro. Coin Grading Serv.*, 898 F. Supp. 2d 365, 383 n.12 (D. Mass. 2012) (quoting *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 750 (1975)); *see, e.g.*, *Antonelli v. New Jersey*, 419 F.3d 267, 273 (3d Cir. 2005) (affirming that non-parties to prior litigation lack standing to enforce consent decrees). Plaintiffs offer no persuasive justification as to why this Court should grant relief allowing amendment or revision of a final judgment issued in a separate federal case.[11]

Second, Plaintiffs cannot point to an independent cause of action that would allow them to enforce the Consent Order entered in *We the People I*. The ordinary vehicle for enforcing a consent order's terms is civil contempt, which supplies no independent cause

---

[10] For the purposes of this Order, the Court finds no meaningful substantive difference between a consent "order" or "decree." Both are products of negotiation between parties and constitute "a final order that 'places the power and prestige of the court behind the compromise struck by the parties.'" *Rolland v. Patrick*, 946 F. Supp. 2d 226, 227 (D. Mass. 2013) (quoting *Williams v. Vukovich,* 720 F.2d 909, 920 (6th Cir. 1983)); *see also Evoqua Water Techs., LLC v. M.W. Watermark, LLC*, 940 F.3d 222, 229 (6th Cir. 2019) ("Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms.") (quoting *United States v. Armour & Co.*, 402 U.S. 673, 681 (1971)).

[11] Plaintiffs do not address the procedural steps typically necessary to modify a final judgment in federal court, which in this instance would include both intervening in the original *We the People I* litigation under Rule 24 and moving for relief from a final judgment under Rule 60(b). Fed. R. Civ. P. 24 (discussing standards and requirements for both intervention of right and permissive intervention); Fed. R. Civ. P. 60(b) (allowing the court to "relieve a party . . . from a final judgment, order, or proceeding" for specific, enumerated reasons).

of action and must instead be brought in the case where the order was entered. *See D. Patrick, Inc. v. Ford Motor Co.*, 8 F.3d 455, 459 (7th Cir. 1993) (holding civil contempt provides no independent cause of action and such contempt proceedings remain "part of the action from which they stem") (quoting 4 Charles A. Wright and Arthur R. Miller, *Federal Practice and Procedure,* § 1017 at 71 (1987); *see also Doe v. Harvard Univ.*, 56 F.3d 59 (1st Cir. 1995) (per curiam) (rejecting a civil contempt claim premised on alleged violation of an order entered in a prior civil case). Plaintiffs' amended complaint further identifies no other independent cause of action that would permit this Court to enforce the Consent Order's purported violations in a separate federal manner.

Third, sovereign immunity independently bars Plaintiffs' request. Even assuming this Court had the authority to amend the Consent Order—which it does not—the Secretary argues, and the Court agrees, that the Eleventh Amendment forecloses relief to the extent Plaintiffs' claims trace back to the Consent Order rather than to any independent violation of federal law. ECF No. 36 at 20–22. The *Ex parte Young* exception to the Eleventh Amendment permits federal courts to "grant prospective injunctive relief to prevent a continuing violation of federal law, in part because a suit challenging the constitutionality of a state official's action in enforcing state law is not one against the State." *Doe v. Shibinette*, 16 F.4th 894, 903 (1st Cir. 2021) (quotation modified). That exception does not, however, extend to instructing "state officials on how to conform their conduct to state law." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). The enforcement of the consent-to-jurisdiction requirement rests on state law alone, specifically 21 M.R.S. § 903-A(4) and Me. Const., art. IV, pt. 3, § 20—not on the Consent Order. Because Counts I and II challenge only the Consent Order and allege no

independent violation of federal law, sovereign immunity bars this Court from considering them.[12]

### C. *Rooker-Feldman* Doctrine

The Intervenors raise another threshold challenge to Plaintiffs' likelihood of success: that the *Rooker-Feldman* doctrine precludes Plaintiffs from relitigating matters finally decided by the Maine state courts in *Gilbert*. ECF No. 35 at 12–13. The Supreme Court has exclusive jurisdiction over appeals from "[f]inal judgments or decrees rendered by the highest court of a State in which a decision could be had . . . ." 28 U.S.C. § 1257(a); *see Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 291–92 (2005). The *Rooker-Feldman* doctrine thus precludes "parties who lost in state court from 'seeking review and rejection of that judgment' in federal court." *Puerto Ricans for P.R. Party v. Dalmau*, 544 F.3d 58, 68 (1st Cir. 2008) (quoting *Exxon Mobil*, 544 U.S. at 284). Consequently, lower federal courts lack authority to review state court judgments. *See Klimowicz v. Deutsche Bank Nat'l Tr. Co.*, 907 F.3d 61, 64 (1st Cir. 2018). The doctrine does not bar claims where a complaint "alleges a constitutional violation by an adverse party" that is "independent of the injury caused by the state court judgment." *Davison v. Gov't of P.R.–P.R. Firefighters Corps.*, 471 F.3d 220, 222 (1st Cir. 2006).

Plaintiffs respond that *Rooker-Feldman* does not preclude consideration of their claims for two reasons: no named Plaintiff here was a party to the *Gilbert* proceedings,

[12] The Secretary further argues Plaintiffs' other claims (Counts III through VIII) alleging violations of federal constitutional law based on her interpretation of the Consent Order are "at best, state-law claims dressed up as federal claims," and are likewise barred by sovereign immunity. ECF No. 36 at 21. Unlike Counts I and II, however, the Court finds the Plaintiffs have, at this stage, pleaded violations of federal constitutional law sufficient to fall within the *Ex parte Young* exception to sovereign immunity. *See Hengle v. Treppa*, 19 F.4th 324, 348 (4th Cir. 2021). Nonetheless, for the reasons already discussed herein, Plaintiffs' are unlikely to succeed on the merits of these claims regardless.

and Plaintiffs challenge only the Secretary's interpretation and application of the Consent Order, whereas *Gilbert* decided whether the Secretary acted within her constitutional bounds. ECF No. 37 at 7–8. Plaintiffs are correct that they were not parties to *Gilbert*. But the limited factual record before the Court suggests that Plaintiffs—both Cairo as a circulator and other Plaintiffs as Maine voters—stand in privity with PGS, the Ballot Question Committee that intervened in *Gilbert*.

Privity "is an elusive concept," but parties may be found to stand in privity where their relationship "is sufficiently close so as to bind them both to an initial determination, at which only one of them was present." *N.L.R.B. v. Donna-Lee Sportswear Co., Inc.*, 836 F.2d 31, 34–35 (1st Cir. 1987) (quotation modified); *see United States v. Wolas*, 520 F. Supp. 3d 114, 137 n.31 (D. Mass. 2021) ("Parties are in privity with one another when the party's legal interests in the state court proceeding were congruent with the privy's legal interests." (quotation modified)).[13] While not ultimately ruling on the issue, the Supreme Court has suggested "there may be circumstances in which *Rooker-Feldman* applies against a party that was not precisely named in the state court proceeding." *Decoulos v. Town of Aquinnah*, No. 17-cv-11532, 2018 WL 3553351, at *9 (D. Mass. July 24, 2018), *aff'd*, No. 18-1820, 2019 WL 11234357 (1st Cir. Dec. 10, 2019) (quoting *Lance v. Dennis*, 546 U.S. 459, 466 n.2 (2006)). In election law disputes specifically, courts have found candidates and their voters may be in privity for *Rooker-Feldman* purposes because "plaintiff voters are in reality the candidates' pawns" when the voters' federal suit, in

---

[13] Although *Rooker-Feldman* is analytically distinct from issue preclusion and collateral estoppel, "federal case law governing the application of preclusion doctrines to nonparties should guide the analogous inquiry in the *Rooker–Feldman* context." *Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 90 (2d Cir. 2005), *abrogated on other grounds by T. M. v. Univ. of Md. Med. Sys. Corp.*, 146 S. Ct. 1739 (2026). The Court accordingly applies the same privity analysis between Plaintiffs and PGS to both issues of collateral estoppel and *Rooker-Feldman*.

effect, "advance[es] only the candidates' interests." *Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 91–92 (2d Cir. 2005), *abrogated on other grounds by T. M. v. Univ. of Md. Med. Sys. Corp.*, 146 S. Ct. 1739 (2026) (finding privity between voters and candidates where voters challenged the same absentee ballots and state election law that candidates had previously challenged and lost in state court).

As in *Hoblock*, the record here suggests Cairo and the Plaintiff voters may be advancing this federal suit merely as PGS's "puppets" or "pawns" following its defeat in state court. The same counsel who represented PGS in state court represents the Plaintiffs here, raising many of the same arguments regarding the legality and application of the consent-to-jurisdiction requirement. Cairo was retained specifically as a "professional petition circulator[]" for PGS's Ballot Initiative effort, ECF No. 29 ¶ 44, and even appeared at the Secretary of State's evidentiary hearing as a witness at PGS's own request, *id.* ¶¶ 67. The three named Plaintiff voters each signed a petition to place the Ballot Initiative on the November general election ballot. *Id.* ¶¶ 46–47, 49. On the record currently before it, the Court finds that Plaintiffs bear a sufficiently close relationship and share "congruent" legal interests to stand in privity with PGS for purposes of *Rooker-Feldman*, though recognizes that further factual development may bear on the ultimate conclusion.

Plaintiffs' second argument—that their instant suit challenges only the Secretary's interpretation and application of the Consent Order, not the constitutional issues decided in *Gilbert*—fares no better. Although Plaintiffs frame their claims as challenges to the Secretary's reliance on the Consent Order to invalidate the signatures, they explicitly seek an injunction against enforcement of, or the outright dissolution of, the consent-to-jurisdiction requirement as applied to out-of-state circulators. *See* ECF No. 29 ¶¶ 34–36, 131 (requesting modification of Consent Order to remove any reference to the consent-to-

jurisdiction requirement). This "recharacterization" of their claims, however, "does not defeat the application of *Rooker-Feldman* here because any finding in [Plaintiffs'] favor would alter the final decisions of the Maine state courts." *O'Connell v. Hughes*, No. 24-cv-00376, 2025 WL 2210087, at *4 (D. Me. Aug. 4, 2025). Granting Plaintiffs' relief here would, in practical effect, overturn *Gilbert*'s holding regarding the legality of the consent-to-jurisdiction requirement and that the Secretary properly invalidated the signatures—precisely the result prohibited by *Rooker-Feldman*.

Additionally, *Rooker-Feldman* independently forecloses jurisdiction over claims "inextricably intertwined" with claims already adjudicated in a state court. *Hill v. Town of Conway,* 193 F.3d 33, 39 (1st Cir. 1999) (quoting *D.C. Ct. of Appeals v. Feldman*, 460 U.S. 462, 483 n.16 (1983)). "A federal claim is inextricably intertwined with the state court claims if the federal claim succeeds only to the extent that the state court wrongly decided the issues before it." *Sheehan v. Marr*, 207 F.3d 35, 40 (1st Cir. 2000) (quotation modified). The doctrine applies "where, regardless of how the claim is phrased, 'the only real injury to [the plaintiff] is ultimately still caused by a state-court judgment.'" *Silva v. Massachusetts*, 351 F. App'x 450, 455 (1st Cir. 2009) (quoting *Davison*, 471 F.3d at 223). Plaintiffs' claims here meet that standard: their actual injury—the invalidation of signatures gathered by Cairo and other out-of-state circulators—was caused by the Law Court's judgment in *Gilbert*. For these reasons, the Court finds *Rooker-Feldman* likely deprives it of jurisdiction over Plaintiffs' claims—a jurisdictional defect that, standing alone, forecloses any likelihood that Plaintiffs will succeed on those claims.

### D. Collateral Estoppel

The Intervenors next raise a related yet distinct argument: even if *Rooker-Feldman* does not deprive the Court of subject-matter jurisdiction, collateral estoppel bars

Plaintiffs from relitigating issues the Maine state courts already decided in *Gilbert*. ECF No. 35 at 13–16. "Collateral estoppel, sometimes called issue preclusion, bars parties from re-litigating issues of either fact or law that were adjudicated in an earlier proceeding." *Patton v. Johnson*, 915 F.3d 827, 833 (1st Cir. 2019) (quotation modified). Under Maine law,[14] "issue preclusion prevents the relitigation of factual issues already decided if the identical issue was determined by a prior final judgment and the estopped party had a fair opportunity and incentive in an earlier proceeding to present the same factual issue or issues it wishes to litigate again in a subsequent proceeding." *Gardner v. Greenlaw*, 2022 ME 53, ¶ 8, 284 A.3d 93 (quotation modified). The Court adopts the preceding factual findings concerning Plaintiffs' relationship with PGS and concludes that, on the present record, Plaintiffs stand in privity with PGS for collateral estoppel purposes.

Plaintiffs assert, largely echoing their *Rooker-Feldman* arguments, that collateral estoppel does not apply because they were not parties to the *Gilbert* litigation and because Maine's state courts "did not, and could not, definitively interpret the meaning of a federal court's consent order." ECF No. 37 at 8–9. Plaintiffs' argument, however, cannot be reconciled with what they actually seek to litigate. The issue *Gilbert* decided—whether the Secretary properly invalidated the signatures gathered by Cairo and other out-of-state circulators—is the same issue Plaintiffs raise here, merely relabeled as a challenge to the "**Secretary's rejection**, in reliance on . . . [the] Consent Order**, of Ballot Initiative petitions circulated by Plaintiff Cairo and three other circulators**." ECF No. 31

[14] Because "a state court judgment is entitled to the same preclusive effect in federal court as it would be given in the state in which it was rendered," *García-Monagas v. De Arellano*, 674 F.3d 45, 50 (1st Cir. 2012), the Court "thus look[s] to Maine law to determine whether the [state court] proceedings must be given preclusive effect," *Better Way Ford, LLC v. Ford Motor Co.*, 142 F.4th 67, 84 n.6 (1st Cir. 2025).

at 4 (emphasis added). A rose by any other name still smells as sweet, and the Secretary's authority to enforce the consent-to-jurisdiction requirement through the Jurisdiction Box, already settled by the Maine Law Court, does not change its scent merely because Plaintiffs have given it a new name.

The second requirement—whether Plaintiffs "had a fair opportunity and incentive" to litigate the issues in *Gilbert*—is likewise satisfied. "A party has a fair opportunity to litigate an issue if that party either controls the litigation, substantially participates in that litigation, or could have participated in the litigation had they chosen to do so." *State v. Williams*, 2020 ME 17, ¶ 16, 225 A.3d 751 (quotation modified). Beyond her privity with PGS, Plaintiff Cairo played a direct role in the *Gilbert* litigation: she submitted a sworn affidavit to the Superior Court regarding her belated consent to Maine's jurisdiction, ECF No. 29 ¶ 61, and, following remand to the Secretary, testified under oath regarding her decision not to check the Jurisdiction Box, *id.* ¶¶ 67–68. While the three Plaintiff voters did not directly participate in *Gilbert*, the Court notes that Maine state law explicitly provided them with the opportunity to do so. *See* 21-A M.R.S. § 905 ("Any voter . . . or any person who has validly signed the petitions, if these petitions are determined to be invalid, or any other voter, if these petitions are determined to be valid, may appeal the decision of the Secretary of State by commencing an action in the Superior Court."). On the record presently before it, the Court accordingly finds collateral estoppel further undermines Plaintiffs' likelihood of success on the merits.

The Court does not purport, on the present record, to conclusively resolve every factual issue bearing on the application of *Rooker-Feldman* or collateral estoppel. At this preliminary stage, however, Plaintiffs bear the burden to establish a likelihood of success before obtaining the "extraordinary and drastic remedy" of injunctive relief. *Kennedy v.*

*Bellows*, 721 F. Supp. 3d 98, 109 (D. Me. 2024) (quotation modified). The substantial questions concerning whether *Rooker-Feldman* deprives the Court of subject-matter jurisdiction and whether collateral estoppel independently precludes relitigation of issues resolved in *Gilbert* foreclose Plaintiffs from making that necessary showing. *See Berlitz Schs. of Languages of Am., Inc. v. Everest House,* 619 F.2d 211, 214 (2d Cir. 1980) (affirming denial of injunctive relief where case raised a "serious question as to whether the doctrine[] of collateral estoppel . . . would bar the instant action"). Aside from these issues, the Court finds that Plaintiffs' likelihood of success on the merits is foreclosed by the issues of standing and jurisdiction over the Consent Order as already discussed.

### E. Summary of Threshold & Jurisdictional Challenges

Standing alone, each of these threshold and jurisdictional defects would likely bar Plaintiffs' claims and thus preclude a finding of their likelihood of success on the merits; taken together, they reinforce the conclusion that Plaintiffs cannot make their necessary extraordinary showing. Notwithstanding these deficiencies, the Court next addresses the substantive merits of Plaintiffs' claims and finds they cannot establish a likelihood of success on the merits there either.

## II. Plaintiffs Cannot Establish a Likelihood of Success on the Merits

To the extent any of Plaintiffs' claims may survive the threshold challenges already addressed above, the Court finds that Plaintiffs cannot establish a likelihood of success on the merits of their claims based on the substance of their arguments—principally because doing so would require disregarding First Circuit precedent in *We the People II*—a path foreclosed to this Court.

The underlying dispute in *We the People* challenged the Maine Constitution's and 21 M.R.S. § 903-A's residency and voter-registration requirements for circulators as

unconstitutional under the First Amendment. *We the People II*, 40 F.4th at 4. In its detailed analysis of the competing interests at stake in the First Amendment inquiry, the First Circuit concluded "[n]othing indicates [] there is a better fit here between the interest in election integrity that Maine asserts and the restriction on who can be a circulator that Maine has imposed through its residency requirement, at least as [that requirement is] applied to out-of-state circulators who first submit to the jurisdiction of the state of Maine for alleged violations of Maine law." *Id.* at 20 (quotation modified). The District Court's subsequent Consent Order, including the consent-to-jurisdiction requirement that Plaintiffs now challenge, directly implements that holding. *See* Consent Order (enjoining enforcement of 21 M.R.S. § 903-A and Me. Const., art. IV, pt. 3, § 20 against out-of-state circulators who affirmatively submit to Maine's jurisdiction). Plaintiffs offer no persuasive reason for this Court to reopen, rewrite, or otherwise amend the final judgment embodied within the Consent Order. Plaintiffs therefore cannot establish a likelihood of success on Counts I and II.

Plaintiffs additionally argue the Secretary's decision to invalidate signatures obtained by Plaintiff Cairo and other out-of-state circulators who did not check the Jurisdiction Box violates the First Amendment, along with an assortment of other constitutional provisions. *See* ECF No. 29 at 24–32 (raising Due Process, Equal Protection, and Privileges and Immunities Clause challenges, along with First Amendment and unconstitutional-conditions claims). Each of these claims rest on the premise that the Secretary misapplied the Consent Order to invalidate the signatures submitted with Cairo's petitions and that the Consent Order, as Plaintiffs assert the Secretary interpreted it, violates federal constitutional law. This argument runs headlong into the First Circuit's decision in *We the People II*, which upheld the very consent-to-

jurisdiction requirement Plaintiffs now attack. Plaintiffs identify no material distinction between the restriction the First Circuit sustained and the restriction they now challenge here—and the Court similarly finds none. The Court accordingly finds that Plaintiffs have not established a likelihood of success on the merits of their constitutional claims.

Even setting that controlling precedent aside, the Court independently analyzes each of Plaintiffs' constitutional claims under the *Anderson*/*Burdick* framework, which governs constitutional challenges implicating the electoral process and core political speech, such as the circulating and signing of ballot initiative petitions. *See Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *Burdick v. Takushi*, 504 U.S. 428, 433–34 (1992); *see also We the People I*, 519 F. Supp. 3d at 39–40 (applying *Anderson/Burdick* to plaintiffs' First Amendment challenge to Maine's voter registration and residency requirements). Under *Anderson/Burdick*, the Court must assess "the burdens, if any, placed on a plaintiff's constitutionally protected rights, followed by an evaluation of the precise interests put forward by the state as justifications for the burdens." *Libertarian Party of N.H. v. Gardner*, 638 F.3d 6, 14 (1st Cir. 2011). Courts apply strict scrutiny and require that the challenged restriction be narrowly tailored to the State's interest only when the restriction imposes "severe burdens" on "core political speech and associational rights." *Buckley v. Am. Const. L. Found. Inc.*, 525 U.S. 182, 206–07 (1999). By comparison, where a challenged restriction on the electoral process "imposes only reasonable, nondiscriminatory restrictions upon the . . . rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions." *Gardner*, 638 F.3d at 14 (quotation modified); *Buckley*, 525 U.S. at 206 (noting that "lesser burdens trigger less exacting review").

Measured against that framework, the consent-to-jurisdiction requirement Plaintiffs challenge—which asks only that a circulator check a box consenting to jurisdiction at the time of submitting the affidavit and signatures—imposes, at most, a minimal burden on the electoral process and Plaintiffs' political speech rather than a severe one. *See Gilbert*, 2026 ME 59, ¶¶ 29–32 (applying "less exacting standard of review" and finding requirement advances important state interest in regulating elections); *see also Buckley*, 525 U.S. at 206 ("[L]esser burdens trigger less exacting review, and a State's important regulatory interests are typically enough to justify reasonable restrictions."). That modest burden stands in sharp contrast to the restriction found unconstitutional in *We the People*: an outright prohibition on nonresidents or unregistered voters collecting signatures as circulators, which the court found imposed a severe burden on core political speech and could not satisfy strict scrutiny. *See We the People II*, 40 F.4th at 23. Where that prohibition foreclosed out-of-state circulators from participating at all, the consent-to-jurisdiction requirement opens the door to anyone willing to affirmatively submit to the State's jurisdiction at the time they submit their signed petitions—imposing only a slight, incidental burden that is reasonable, nondiscriminatory, and justified by the State's well-documented and important interest in safeguarding the legitimacy of its elections. *See We the People I*, 519 F. Supp. 3d at 24; *see also Buckley*, 525 U.S. at 206 ("States, of course, must regulate their elections to ensure that they are conducted in a fair and orderly fashion."). The Court accordingly finds that Plaintiffs have failed to demonstrate a likelihood of success on the merits of their constitutional claims.

Before turning to the remaining factors in the preliminary injunction inquiry, the Court briefly addresses Plaintiffs' Due Process argument and claim. Because Plaintiffs

were not parties to the original *We the People* litigation and played no role in drafting the Consent Order arising from that litigation, they argue that enforcing the Order against them violates their Due Process rights, since they received neither notice nor an opportunity to be heard. ECF No. 31 at 17–18. This argument suffers from the same defect as Plaintiffs' other constitutional claims: it assumes the Consent Order, rather than Maine's Constitution and state law, is what binds circulators to consent to Maine's jurisdiction. While it is indeed "a violation of due process for a judgment to be binding on a litigant who was not a party . . . and therefore has never had an opportunity to be heard," *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 327 n.7 (1979), Plaintiffs' argument rests on a flawed premise: that the Consent Order binds their conduct—when in fact it binds only the Secretary's. The provision of the Consent Order Plaintiffs now challenge, Paragraph 2(a), restricts only the Secretary from enforcing blanket residency and voter-registration requirements; it imposes no binding effect on Plaintiffs' conduct. And as the Law Court established in *Gilbert*, it is Maine's constitution and state law—not the Consent Order—that requires circulators to consent to jurisdiction. For these reasons, Plaintiffs' Due Process challenge likewise fails.

The Court accordingly finds minimal likelihood of success on the merits—in large part based on the First Circuit's ruling in *We the People II* regarding the constitutionality of Maine's residency and voter-registration requirements as applied to out-of-state circulators who satisfy the consent-to-jurisdiction requirement. Under *Buckley* and other federal case law pertaining to the constitutionality of election regulations, the application of the consent-to-jurisdiction requirement to out-of-state circulators does not impose a severe burden on Plaintiffs' core political speech, is both reasonable and nondiscriminatory, and furthers the State's important interest in the enforcement and

integrity of its elections. For all of these reasons, and those already discussed regarding the threshold and jurisdictional deficiencies present in the Plaintiffs' amended complaint, the Court finds that Plaintiffs have not satisfied the first factor of the preliminary injunction standard: likelihood of success on the merits of their claims.

## III. The Remaining Factors Do Not Favor Injunctive Relief

### A. Irreparable Harm

Plaintiffs' argument regarding irreparable harm rests entirely on a presumption they have not earned. They contend that because "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," irreparable harm must be presumed once a court determines Plaintiffs are likely to prevail on their First Amendment claims. ECF No. 31 at 5 (quoting *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 10–11 (1st Cir. 2012) (quotation modified). That presumption never triggers here because the Court has already found Plaintiffs unlikely to prevail on those claims and Plaintiffs develop no separate argument for irreparable harm independent of the merits presumption they invoke. The Secretary and Intervenors press the converse of that same logic—because Plaintiffs cannot show a likelihood of success, they cannot show a likelihood of irreparable harm either—and the Court agrees. ECF No. 35 at 24; ECF No. 36 at 23–24; *see also Baber v. Dunlap*, 349 F. Supp. 3d 68, 79–80 (D. Me. 2018) (finding no potential for irreparable harm where plaintiff had not established constitutional violation with respect to state law election regulation).

That said, the Court is cognizant that, absent an injunction barring the Secretary's enforcement of the consent-to-jurisdiction requirement, the Ballot Initiative will not appear on the November general election ballot. The Court recognizes the reality of that consequence, but finds it is not enough, standing alone and without further support, to

overcome Plaintiffs' minimal likelihood of success on the merits. *See Doe v. Trump*, No. 1:25-cv-13946, 2026 WL 1170971, at *20 (D. Mass. Apr. 30, 2026) (finding no irreparable harm for plaintiffs who did not submit declarations in support of preliminary injunction motion and therefore had "not made any showing" they would experience irreparable harm absent injunctive relief). And so, although irreparable harm is the closest of the four preliminary-injunction factors, Plaintiffs still fall short. Any harm they may suffer does not outweigh their minimal likelihood of success on the merits.

### B. Balance of Equities and the Public Interest

Because the State, through the Defendant Secretary of State, is the opposing party, the balance of equities and public interest factors merge for the Court's consideration. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The Court finds both factors weigh heavily against granting Plaintiffs' requested injunctive relief, in large part because Plaintiffs waited until the eleventh-hour to seek it.

The consent-to-jurisdiction requirement Plaintiffs now challenge was no late-breaking development: the Secretary first stated it in instructions issued to circulators in November 2025. ECF No. 36-2 ¶ 8. On April 17, 2026, the Secretary submitted her brief to the Maine Superior Court, taking the position that the 1,520 elector signatures on the four petitions circulated by out-of-state circulators, including Plaintiff Cairo, who had not checked the Jurisdiction Box should be invalidated. ECF No. 29 ¶ 57. Despite that early notice, Plaintiffs waited until June 30, 2026, to seek relief in this Court, and did not move for emergency injunctive relief until July 20, 2026—mere weeks before the applicable ballot distribution and printing deadlines. See ECF No. 36-2 ¶¶ 23–26 (ballots must be finalized by August 25, 2026, to allow ample time for printing and distribution, and noting that any further delay "could jeopardize the [Secretary]'s ability to meet the ballot

distribution deadlines in state and federal law”). Granting an injunction against enforcement of the consent-to-jurisdiction requirement—and thereby validating the previously invalidated signatures—would force the State into a scramble to finalize and distribute general election ballots, while simultaneously circumventing the Maine Law Court’s ruling on the requirement’s legality. Such a disruptive result weighs heavily against the balance of equities and finds little support in the public interest.

The Secretary and Intervenors also point to 21 M.R.S. § 905, the state statute establishing an expedited process for resolving disputes over ballot initiatives such as the present dispute here. ECF No. 35 at 24–25; ECF No. 36 at 24; *see* 21-A M.R.S. § 905(2) (setting forth the procedure for appealing the Secretary of State’s determination on a ballot initiative petition’s validity to the Maine Superior Court). Indeed, the Intervenors invoked that very process in *Gilbert* to challenge the Secretary’s Initial Determination that the signatures and thus Ballot Initiative were valid. PGS—represented by the same counsel who now represents Plaintiffs—raised many of the same challenges to Maine’s voter-registration and residency requirements for circulators, and the state’s highest court ultimately rejected them. In resting on principles of federal-state comity and deference to state courts’ familiarity with their own election law and procedure, the First Circuit has previously declined to review “final state court determinations” regarding the validity of similar ballot initiative petitions. See *Henry v. Connolly,* 910 F.2d 1000, 1002 (1st Cir. 1990) (rejecting a federal appeal challenging a state constitutional requirement, following state court litigation, that signers of ballot initiative petitions, “at or before the time they subscribed their names to the petition, must have had ‘before them’ a copy of the full text of the actual petition”). Alongside the formal doctrines of *Rooker-Feldman*

and collateral estoppel already discussed, these principles of comity and deference further tilt the balance of equities against injunctive relief.

On the other side of the scale, Plaintiffs will suffer harm from the Ballot Initiative's absence from the November 2026 general election ballot. This harm, however, is largely self-inflicted. The First Circuit affirmed the legality of the consent-to-jurisdiction requirement well before Plaintiffs' political activity began. *See We the People II*, 40 F.4th at 20. More recently, in *Gilbert*, the Maine Superior Court found that Cairo's decision not to check the Jurisdiction Box was no inadvertent error, but rather an affirmative choice made "due to unresolved questions about the implications of such consent." ECF No. 15 at 8. Moreover, any harm to Plaintiffs is temporary rather than permanent; they remain free to gather signatures to place the Ballot Initiative on the 2027 general election ballot by following the already established election procedures. The public interest strongly favors the consistency and regularity of state elections achieved through enforcement of election regulations such as the one at issue here. Accordingly, both the balance of equities and the public interest weigh against granting injunctive relief here.

## CONCLUSION

For the reasons already discussed, Plaintiffs have not established a likelihood of success on the merits of any of their claims, and the remaining preliminary injunction factors likewise do not favor relief. Plaintiffs' motion for a preliminary injunction, ECF No. 30, is **DENIED** as to all Plaintiffs.

**SO ORDERED.**

Dated this 20th day of August, 2026.

/s/ Stacey D. Neumann
**UNITED STATES DISTRICT JUDGE**